Everyone looks like they've collected their materials, so our next case for argument is AdHealth, Limited v. PorterCare Adventist Health Systems, docket 24-1273. Counsel, please proceed when you're ready. Thank you, Your Honor. May it please the Court, Marshall Galinsky from Anderson-Kill for the appellant. This case is an insurance coverage dispute. It involves coverage under a hospital professional liability insurance program. It's a $40 million insurance program that sits above, made up of two layers of excess insurance, that sit above a $2 million self-insured retention. Coverage applies based on medical, per medical incident. The significance of that, Your Honors, is that you need to have a $2 million loss in indemnity costs for a given medical incident to exhaust the $2 million self-insured retention and to attach to the excess coverage that's provided. That coverage applies in a way so that you have more than a $2 million loss for a given medical incident. You then have up to $40 million worth of coverage for each medical incident. There's also a non-stacking provision in the insurance program that says that where you have a medical incident that results in claims across numerous policy periods, that all of those claims are grouped together for that medical incident into a single policy year under the year in which the first claim was made. The claims that we're dealing with here involve Porter Hospital in South Denver. In 2018, there were a number of lawsuits that began in 2018 and 2019. They were all alleging it was a mass court litigation, some were class actions, some were mass court cases that all involved the same problem. There was an alleged breach in the surgical sterilization procedure at the hospital from June 2016 to April of 2018. That resulted in a large number of these cases that were all brought against the hospital involving that same problem. The question here is, that needs to be resolved by the court, is whether that sort of mass tort or class action litigation brought on behalf of thousands of different patients is grouped together under the hospital's insurance program as a single medical incident and therefore is subject to one $2 million self-insured retention and one policy limit in one policy year. Whether that's Porter's position, is that these, because they all involve the same actor or mission, that they're grouped together as a single medical incident, or whether, as the insurance company contends, you can group them together under one policy year and one policy limit, but simultaneously split them apart into thousands of separate medical incidents in order to impose thousands of $2 million self-insured retentions. The net result of that would, of course, be to eliminate all insurance coverage for the hospital for the cost of resolving the sterilization claims that are at issue. Could you walk us through the language of the medical incident provision itself and explain how the district court erroneously construed the plain language of that provision? Of course. And the definition of medical incident is, of course, the most important part of the policy in terms of answering this important question. It's found, I have it here, and I imagine your honors have studied it as well. It's found on page 172 of the appellate record. Medical incident definition begins by referring to an actor or mission, and then it lays out a number of different types of hospital services that are performed that could relate to the actor or mission. It's the first paragraph that is most important here, your honors. So the definition then defines medical incident to mean any act or omission in the providing of professional health care services to the participants, patients, that's plural possessive, participants, patients, plural, and then it gives a number of different types of services that hospitals provide to their patients, which results in injury to a patient. So, again, there's a couple of key components to this. It's an en act or omission in providing services to the participant's patients that results in injury to a patient. Okay? What Ad Health has argued for and what the district court found is a misinterpretation of that foundation to the definition of medical incident. What the district court interpreted that provision to mean, and I'll read from the district court's decision, is that a medical incident exists where an act or omission provides health care services to a patient, singular, not the participant's patients, plural, but to a patient, singular, and that act or omission results in injury to that patient. Whereas the policy wording refers to a patient, which uses a, an indefinite article, which leaves open which patient, the district court found and Ad Health advocates for an interpretation of that patient using a definite article. You're certainly correct about that. I mean, we can just know you're right about that by reading the order and then reading the provision. My question is, even assuming that that is correct, that the district court misspoke or miswrote or something like that, how do you account for the provision in C.Y. that begins, it's after number three, it begins any such act or omission together with all related acts or omissions in the furnishing of such services to any one person shall be considered one medical incident? Right. So the first provision, which we've discussed so far, has a grouping quality to it, right? If you have multiple patients, again, it specifically speaks to providing health care service to the participant's patients, but they involve the same act or omission that those things are grouped together under the definition of medical incident. Pause there, pause with the patients, because that seems to be really the biggest argument that you're making, is the plural there, patients. But why would I not read that to simply say to the participant's patients as opposed to some other class? First of all, it's got to be your patients. And second of all, it's patients, not employees or some other group that you can think of. That's my most natural reading. Tell me why that's wrong. That's exactly the type of claim that's insured under this policy. We have a medical malpractice policy. What it envisions is claims brought by people who are harmed by the care that's provided by the hospital. If there's harm to an employee or someone like that, there's other types of insurance that provide coverage for that type of a claim. Well, what if you have 50 botched knee surgeries and the total bill, let's say, $40 million? Your position would be $40 million in coverage because these are all botched knee surgeries? It's hard to see how 40 botched knee surgeries would all involve the same act or omission. What we have here in the sterilization claims below, all of those claims allege identical act or omission by the hospital. They're separate. It wasn't one contamination. It was contaminations over time, was it not? Yes. The surgeries that happened were over time. But if when you look at the complaints and the motions that were filed by the plaintiffs in those cases and the judge's decisions in consolidating those cases, they are identical from one to the next. I don't want to ignore Judge Rossman's question, though, because it's a very important question to understand the two components of the medical incident definition. And Judge Phillips, I definitely intend to return to the discussion of the facts of the underlying cases as well, because that's also very important. There is this separate provision clause toward the end of the medical incident definition that says, and this also has a grouping function as well. It says any act or omission together with related acts or omissions. So this deals with a situation where we have multiple acts or omissions that are at issue in a particular claim. And the furnishing of such services to any one person will be grouped together as a medical incident. Why doesn't that unambiguously define medical incident by patient? These two provisions, these two components to the medical incident definition serve two different purposes. The first and the foundational definition where you have any, a medical incident means any act or omission in providing health care services to multiple patients that results in injury to a patient, right? That has a function of grouping these claims together, as long as you have claims by multiple patients that allege the same act or omission. But the language is integrated. It says any such act or omission. I mean, I think your reading requires us to bifurcate why into these two separate grouping mechanisms, but that provision that we're talking about now seems to integrate them. I think you need to read the provision as a whole and understand what it's designed to do as a whole. So we just don't think about the word such? No, no. I'm not saying that at all, Your Honor. What I'm saying, when you look at it as a whole, the purpose of the provision is to group claims together. And both of the two parts of the provision that we're talking about, both do that in different factual scenarios. With respect to the first, you're dealing with a factual scenario where you have one act or omission, services to multiple patients, and injury to a patient or one or more of those patients. In the second scenario, you're dealing with a situation where you have multiple related acts or omissions in providing services to any one patient. And in both situations, you group those things together, and the result is you have one medical incident. Think about it this way. Any hospital would expect that it would have coverage for mass tort claims that are brought against the hospital that involve the treatment of multiple patients, okay? If you contract for them. That's correct, Your Honor. And we believe, Porter believes that it did contract for that here. Firmly believes that it did contract for that here. If every single patient's claim is always splintered into a separate medical incident, subject to a separate $2 million self-insured retention, there would never be any coverage for one of the worst possible scenarios that a hospital would face. That is, mass tort or class action litigation against the hospital. That defies the reasonable expectations of a policyholder in putting together its insurance program, and it defies the expectation. And Colorado law makes it clear that in interpreting insurance policy provisions, it's the job of the court to effectuate the reasonable expectations of the policy. But isn't our first job, excuse me, to give the words contained in the contract their plain and ordinary meaning? I mean, isn't that what Colorado law says is our first job? And if we can do that, then we don't go beyond that? That's correct, Your Honor. And I think the plain and ordinary meaning here is clear. We have a provision that groups claims as a medical incident where they involve the same act or omission, and if we have multiple acts or omissions in providing health care services to any one patient, then those acts or omissions are grouped together. But your argument about the party's expectations of coverage, and I believe in your briefs you also talked about the insurance industry, customs. But, again, is that relevant at all under Colorado law? I absolutely agree with Your Honor that the key is the policy language, and that if the policy language is unambiguous, you don't move beyond that. Here I would argue that the rule for determining if a policy language is ambiguous is whether or not the policyholder has offered a reasonable interpretation of that language. I think the interpretation that Porter has offered here is the correct interpretation of the language. At a bare minimum, it is a reasonable interpretation, and in that instance Colorado law is clear. You interpret it in favor of coverage and against the insurance company's drafter. What if you had a single episode and an injury from an act or occurrence? There was a $5 million verdict. The policy would cover the hospital for $3 million, right? That's correct. In other words, the company, the hospital, is getting something for its premium, which is that. Yes. And if you had three patients that were seeking coverage that all alleged that same act or omission, then there would be coverage for that, too. Excess would be grouped together, and they'd have coverage for that excess of $2 million instead of excess of $6 million. I see I'm running low on time. I'd like to reserve time for rebuttal, and I do, of course, like I said before, want to answer your question to get into a little more detail about the act or omissions issue here. Please reserve your time. Thank you. Thank you, Your Honor. Good morning, Your Honors. Jane Young, appearing on behalf of Ad Health. May it please the Court. Ad Health here in this case is neither splintering claims nor denying coverage. The question here is not about a denial of coverage, but rather how the Ad Health excess policies should respond to the hundreds of different claims alleged against PorterCare by the hundreds of different patients. The issue to be decided by this Court is whether the underlying actions filed against PorterCare that allege multiple acts or omissions by multiple medical personnel and the functioning of health care services over a multiple period of years constitute a single medical incident under the definition of the policy. The answer is no, and thus there is no basis for reversal, and the district court opinion should be affirmed. As my colleague had noted, this is an insurance coverage dispute. The policy dictates our analysis and the Court's resolution. Pursuant to the unambiguous definition of medical incident in the- Counsel, can I stop you there and ask you, what is your test for ambiguity? Because I just heard Mr. Galinsky offer a test that differs from how I read your response brief. So how would you say, or what is the test that we would have to apply under Colorado law to determine whether or not this definition is ambiguous? Under Colorado law, the test for ambiguity is whether a policy provision is reasonably susceptible to more than one interpretation. If it's not, it's unambiguous, and that test is an objective test based upon the four corners of the policy language first and foremost. Because they just argued the test is whether the policyholder has offered a reasonable interpretation of the definition, so you disagree with that? I suppose in practice that may be more semantics than anything else, because the question is whether or not there's more than one reasonable interpretation. Whether or not it's presented by the policyholder or whomever, the question is whether or not there's more than one reasonable interpretation, and in our view, at this point, there is not. What do we do with the district court's use of the that patient language, which is not what the policy says? Yes, Your Honor, and I appreciate that question. I myself have given that a great deal of thought as well in preparing for today and today's argument. At the end of the day, this Court's review is de novo, and it is our view that the policy language, the unambiguous policy language, supports affirmance of the district court's order. But the district court's point when you review her order in totality was refuting and rebutting Porter Care's position that the definition of medical incident supports the idea of a plurality or a grouping of multiple patients' acts or omissions together as one medical incident. And so I think the district court inartfully used a paraphrase in her order to support and rebut the idea from Porter Care that this is a plurality versus what the language says, which is a singularity. The language speaks to health care services resulting in injury to a patient, and then grouping, as Your Honor has indicated, such act or omission, including all related acts or omissions, based upon whether or not those medical services are provided to one person or more than one person. That's helpful. Thank you. The district court didn't focus much on that any one person language of the medical incident policy or provision. It seems clear to me that that supports you. Maybe you could explain why I'm right. Well, from my perspective, Your Honor, in terms of looking at the definition and the policy in totality, it's what makes sense based upon what's provided in the policy language. It's also the same language that's in the health care trust, which is part of the underlying amounts, and that rests as the underlying coverage beneath the excess policies. But we don't look at that. We're only looking at this. Correct. But it does go to some consistency in terms of providing the tower of coverage. But why doesn't it create two categories or sort of a two-bucketing structure, as the appellant argues? Why should we read this provision, any such act or omission, to any one-person provision as integrating? That's how I read it. Why isn't it possible that it's actually just referring to a different type of bucketing of the claims? Because the language that speaks to the phrase that speaks to any such act or omission and grouping those related acts or omissions is the only grouping language in the definition. The definition of medical incident that starts out in the beginning that refers to any act or omission, and the provision or failure of providing health care services, which results in injury to a patient, isn't grouping anything. And it's certainly not grouping claims, because missing from the definition of medical incident is the defined term claim under the policy. What that initial phrase is doing with, because, again, there's three different sections to the definition of medical incident, one, two, and three. We're focused on one because that's the applicable provision in the definition. It's qualifying and identifying in the policy what it means to be a medical incident. How do you create a medical incident? So there isn't actually any grouping language as to how you're grouping any act or omission together. You're simply identifying in that first section of the definition what is a medical incident. The grouping language then appears towards the later part of the definition and speaks to any such act or omission, together with all related act or omissions, and determining whether or not and how you group them is based upon whether the medical services are provided to one person or more than one person. I appreciate that we're on de novo review here, but was that argument advanced by you in the district court with respect to that, any such provision? In terms of our reliance upon the language, Your Honor? Yes. It seems that the arguments were focused more on why one and less on that last part of the medical incident definition. I just want to make sure that I'm not missing somewhere in the record where you were advancing arguments on this part of the medical incident definition. No, I think the touchstone of the briefing at the district court as well as to this court is fundamentally based upon that grouping language and our reliance upon it to demonstrate how, under this factual scenario and this particular policy language, the sterilization actions should be applied and how the policies would respond to them. I think that language is in our briefing. It is referenced and explained as a basis for our position as to how and when any medical incidents would be grouped. And, in fact, when we think about from the plain language of the definition, how could this language apply? In this factual scenario, it does not, in our view, allow Porter Care to group these hundreds or thousands of different claims with different patients receiving different treatment as one medical incident. But how does it reply? So this language, which is one type of many types of language that's available in hospital professional liability policies. So let's take for an example. A patient is admitted to the emergency room for a broken leg, and it's determined that he needs surgery to fix that broken leg. He goes through surgery. On his way back to his room after surgery, the gurney tips over and he sustains a further injury. Then when he returns to his room, he develops a fever because of some sort of infection as a result of the surgery. This language is intended to kind of funnel down to the medical services that are provided to and result in injury to that patient. All of those actual remissions and related actual remissions in providing health care to this hypothetical patient would all be grouped together as one medical incident. And in the event the claim or claims that arise out of this medical incident would exceed the $2 million underlying coverage, there would be coverage available for PorterCare up to $40 million per medical incident under the policy. And simply because there is different language as a division of this court recognized in the American Southwest case in which this court interpreted different related acts, language, and how related acts are determined, we interpret this language based upon the plain language in front of us under Colorado law. Now, what's missing from this definition and what PorterCare would need to support this interpretation are words like multiple, the same, similar, joint, common. None of those words are contained in the definition of medical incident that would allow them to group acts or remissions provided in connection with different medical treatment to different patients. Are there such policies? Do you insure something like that? I believe there are such policies. In fact, I think when you look at the development of this types of language in terms of how you group treatment or how you group related acts or remissions, this language has developed over the years. And there is likely out in the marketplace at this point in time coverage that could be secured. In fact, the coverage that was secured for the 2019 policy would provide as such. So you're unsure? No, I'm not unsure, Your Honor. I believe there is. And the example of that is the 2019 policy that was secured by PorterCare after this 2018 policy that we're dealing with today expired. So it does exist. But the fact that it does exist from our perspective, Your Honor, does not make this language improper or ambiguous under Colorado law. It should be interpreted according to its plain and ordinary terms. Now, PorterCare has also mentioned a couple of other different policy provisions which it believes supports its position that these hundreds of thousands of different claims should be grouped together as one medical incident. One of those provisions is the limitation of liability provision. This was addressed by the district court, and the district court determined. Yes, sir? Judge Phillips, you look like you have a question. I oftentimes do. General confusion. No, I have no question. Okay, I apologize, Your Honor. And PorterCare believes that it's this position or this policy provision that groups claims. At the end of the day, as the district court noted, with the limitation of liability provision, it's self-explanatory. By its terms itself, it identifies ADHEL's limit of liability. And ultimately, in interpreting this provision, PorterCare is conflating, once again, the terms claim and medical incident. There can be no dispute that more than one claim can arise out of any one medical incident. That was identified by the district court, and the two cases around the country that have addressed similar language has found the same. You can have a situation in which you have more than one claim that arises out of treatment to a patient. The district court thought those cases weren't relevant because she relied on the plain language of the medical incident provision. Would you like us to endorse that rationale, or do you think we need to review those cases and the other components of this policy in order to discern the plain meaning? Well, I think there's two pieces to that, Your Honor. One, I believe the plain meaning of this policy is evident, and it can be resolved as such. But I do believe the John Patty and the Harris Methodist case do provide, while not binding precedent on this court, they are the only two cases around the country that my office has found or that any of the lawyers representing Ad Health have found that provide some instruction and guidance with respect to the interpretation of this language, if there's any doubt. For example, in the John Patty case, it did interpret this type of language, very similar policy language, in the context of a limitation of liability provision. And the Missouri Supreme Court of Appeals noted that more than one claim can arise out of the treatment to any one patient and that reading these two provisions together was actually consistent and therefore reading the policy as a whole and that the only reasonable interpretation of this language was that separate treatment to separate patients results in separate medical incidents. Counsel, you mentioned in responding to one of Judge Phillips' questions that PorterCare, in this case, in 2019, secured a policy that provided for the sort of claims batching it contends is already supported by this policy. Is that correct? Yes, it did secure that coverage with the 2019 policy, yes. Was evidence of that 2019 policy before the district court at summary judgment? It was. That policy is in the record, Your Honor. Do you know where? Can you tell us where it is? May I have just one moment? I believe it's in the first volume of the appellate record. Okay, but it's in the record on appeal before us. It is. I might have a site, Your Honor. And it was definitely before the district court at summary judgment? Yes, Your Honor, it was. And I apologize, I did not have that site in my outline. Excuse me. You can look as you sit down and just tell us at the end of the argument. Okay, I will. I just did not bring that notebook up with me. I apologize. Thank you. And then very briefly, the final policy provision that PorterCare is relying upon, which again the district court refuted in support of her opinion, was the anti-stacking clause. And Mr. Galinzi has mentioned that this morning. At the end of the day, pursuant to its plain meaning, the anti-stacking clause only applies when a claim is going to span more than one policy. Here, the claims were only paid under the 2018 policy. They were not paid under the 2019 policy. And the excess policies only apply coverage above the underlying amounts, which is the public, the PorterCare trust case. I see that I am out of time. Thank you, Your Honors. We ask that the court affirm the district court's ruling. Thank you. Your Honors, yes, the insurance company agreed in responding to the claim that the non-stacking provision applied. That's why claims made in 2018 and 2019 were treated only under the 2018 policy. And that non-stacking provision groups claim by multiple persons or organizations over multiple policy years involving the same loss event. Loss event is defined in the policy to mean medical incident. So the reason why all of those claims from 18 and 19 were treated together in 2018 was because they involved the same medical incident. That is, they involved the same issues regarding the single act or omission that was alleged. And so I'd like to return, as I promised I would, to Judge Phillips' question. When you look at the complaints in the sterilization actions, they're cut and pasted one from the next, all making the same allegations. Yes, they involve different patients who receive surgery on the different days, but the bases of liability, the statutory conditions involved, the punitive damages arguments, the causation are all identical. No one of those cases varies from one to the next regarding anything that happened to any one of those patients. On the motions to consolidate, what the plaintiffs argued, these cases implicate identical negligence principles, identical outrageous conduct principles, identical statutory principles. The claims and defenses are all identical, and the judges agreed in consolidating. There's no difference one case to the next, patient by patient, that justifies treating them as thousands of different medical incidents. They all involve the same act or omission, and the policy defines an act or omission in providing medical services to the participant's patients as a medical incident. When you have a medical incident, and the losses exceed $2 million for that medical incident, you trigger the coverage that's provided here. The Gurney example... You're out of time. Oh, am I? I see it's counting the other direction. I just want to be fair on the time, and you're a minute over, and so we appreciate your argument, though. Counsel, did you have the record citation? I did. The 2019 excess policy is located in Volume 2, pages A1647 through A1716. Okay, thank you. And thank you both for your helpful arguments. Counsel are excused, and the case is submitted. We will now take approximately a 10-minute break. Thank you.